UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CYNTHIA LEE GASSMANN,<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY AND COMPANY, et al.,<br><br>Defendants. | Civil Action 03-02592 (HHK) |

MEMORANDUM OPINION AND ORDER

Plaintiff, Cynthia Lee Gassman, brings this products liability action against Eli Lilly and Company ("Eli Lilly") alleging she suffered injuries resulting from her embryonic exposure to Diethylstilbestrol ("DES"), a pharmaceutical produced and sold by Eli Lilly. Presently before the court is Eli Lilly's motion for summary judgment [#11]. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be denied.

I. BACKGROUND

A. Factual History

DES is a synthetic estrogen that was developed and prescribed in the mid-twentieth century to prevent miscarriages and premature deliveries. An estimated five to ten million individuals in the United States were exposed to DES between 1938, the year it was first prescribed, and 1971, the year that the FDA advised physicians to stop prescribing it to pregnant

women because of its links to a rare vaginal cancer in female children.[1] According to the Center for Disease Control, medical research over the past thirty years has confirmed that women who were prescribed DES while pregnant have an increased risk of breast cancer and the women born of DES patients have increased risks of vaginal and cervical cancer, reproductive tract structural differences, pregnancy complications, and infertility. *See* CDC, ABOUT DES, http://www.cdc.gov/des/consumers/about/index.html.

In 1968, Gassman's mother, Lois Tholke, was prescribed DES by her treating obstetrician while she was pregnant with Gassman. Tholke remembers ingesting "a small white pill," but does not recall any other identifying characteristics of the DES pills she ingested or any information regarding the pills' manufacturer. At that time, DES was produced by over 75 companies, many of whom produced DES in the form of a small white pill. The current owner of the pharmacist where Tholke filled her prescriptions in 1968 stated that, although he did not own the store at the time, he personally observed that "the sole and exclusive brand of DES in the store was the Eli Lilly Brand, from the late 60s through the time I actually bought the store" in 1975. Pl.'s Opp'n, Exh. 25 ¶ 8.

On September 14, 1968, Gassman was born in Mineola, New York. In her early teens, she learned from her mother that she had been exposed to DES *in utero*. In October 1990, almost ten years after learning of her DES exposure, Gassman married her husband, Daniel Gassman. Less than a year later, Mr. Gassman was diagnosed with Hodgkin's disease, a cancer that starts in lymphatic tissue. As a result of this diagnosis, Mr. Gassman was required to undergo

---

[1] This estimate includes the women who were prescribed DES while pregnant as well as the female and male children born of these pregnancies.

chemotherapy treatments that would ultimately leave him sterile.  Prior to the beginning of his treatment, Mr. Gassman had samples of his sperm frozen so that he and his wife could attempt artificial insemination at a later date.

Between July 1997 and June 1998, Gassman underwent three Intra-Uterine Inseminations with her husband's frozen sperm.  Ultimately, none of the three inseminations resulted in pregnancy.  Prior to these procedures, in May 1997, Gassman met with Dr. Serena Chen for an initial fertility consultation.  Dr. Chen's notes from that consultation indicate that she "[r]eviewed with patients [the Gassmans] concerns about DES exposure, such as increased risk for poor pregnancy outcome, such as ectopic pregnancy, pre-term labor, cervical incompetence, etc." Def.'s Mot, Exh. 5.  Gassman denies that she was told in any definitive manner that DES caused her infertility or even that she was infertile.

In or about June 1999, Dr. Chen told Gassman that she "had a T-shaped uterus from DES exposure." *Id.*, Exh. 3 ("Gassman Dep."), at 69.  Dr. Chen's medical records from July 5, 1999, indicate that she "reviewed DES" and its "effect on fertility." *Id.*, Exh. 6.  Gassman denies that Dr. Chen ever indicated that Gassman's T-shaped uterus or her DES exposure were related to her problems becoming pregnant.  In fact, Gassman alleges that her doctors informed her that her chances of becoming pregnant using her husband's sperm were still good.  She states that, at least until September 2000, she believed that her difficulties becoming pregnant were not a result of her *in utero* DES exposure, but rather were "due to [her husband's] chemotherapy." Pl.'s Opp'n, Exh. 20 ("Gassman Statement") ¶ 3.

Gassman claims that it was not until 2002, "at the earliest," that she ever "had the slightest idea or suspicion that [her] injuries or infertility were caused by the wrongful conduct of the company that made the DES [her] mother took while pregnant with [her], or that anyone was suing over DES injuries, or that the manufacturer had done anything wrong." *Id.* ¶ 4. Gassman indicates that she did not attempt to educate herself about the effects of DES "because there was nothing I knew to investigate. . . . I knew I was affected by DES, but there was still very positive a chance to become pregnant. There was nothing to investigate, it was a side effect of being born." Gassman Dep. at 26. She also suggests that she did not investigate the possibility of a lawsuit because she "thought the company had tested the drug before they put it on the market," and because she "believed the drug saved [her] life." Gassman Statement ¶ 5. She states that she first learned about DES lawsuits in 2002. Prior to that date, she alleges that she never researched DES on the internet, never read legal or medical magazines about DES, never watched any television program about DES, never listened to any radio show about DES, and never joined any DES support group. *Id.* ¶¶ 6–10.

**B. Procedural History**

Gassman filed suit in D.C. Superior Court on February 19, 2003, naming five pharmaceutical companies—Eli Lilly, GlaxoSmithKline, Bristol-Myers Squibb Co. ("Bristol-Myers"), Pharmacia and Upjohn Company ("Pharmacia"), and Dart Industries Inc. ("Dart")—as co-defendants. Her complaint alleges that Gassman suffered injuries including cervical and uterine malformations resulting in infertility as a result of her embryonic exposure to DES. She seeks compensatory and punitive damages against the pharmaceutical companies under theories of negligence, strict liability, breach of warranty, and misrepresentation.

Because both Gassman and Bristol-Myers were citizens of New York, the case as originally filed was not removable. On December 2, 2003, a Praecipe of Dismissal was filed in D.C. Superior Court, dismissing Bristol-Myers and Pharmacia with prejudice. Less than a week later, GlaxoSmithKline was also dismissed from the case. Soon thereafter, on December 19, 2003, Eli Lilly removed the case to federal court. Dart was eventually dismissed with prejudice on January 14, 2004, leaving Eli Lilly as the sole defendant.

Eli Lilly filed the present motion for summary judgment on December 1, 2004, arguing that all of Gassman's claims should be dismissed because they are barred by the applicable statute of limitations and because Gassman cannot identify Eli Lilly as the manufacturer of the drug at issue in this case.

## II. ANALYSIS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24

(1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor.  *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50.

**A.  Statute of Limitations**

Eli Lilly asserts that summary judgment is appropriate because Gassman's claims are time-barred.  Eli Lilly also asserts that New York statute of limitations, rather than District of Columbia law, may govern Gassman's claims.  Both the District of Columbia and the state of New York have a three-year statute of limitations applicable in cases like this one.  *See* D.C. Code § 12-301(8); N.Y. C.P.L.R. 214(5).  New York, however, offers plaintiffs an alternate limitations period if they are unable to learn the cause of their injury within three years of discovering it.  In such cases, a plaintiff has five years from discovering her injury to determine its cause, and then one year from determining its cause to file suit.  N.Y. C.P.L.R. 214-c(4); *Ruffing v. Union Carbide Corp.*, 746 N.Y.S.2d 798, 804–05 (N.Y. Sup. Ct. 2002).  The District of Columbia applies a more fact-based discovery rule to determine when a cause of action accrues, discussed *infra*, which in many situations is more beneficial to plaintiffs.

*1. Choice of Law*

Eli Lilly suggests that Gassman's claims are time-barred under either the New York or District of Columbia statute, but suggests application of the New York statute is more appropriate. Def.'s Mot. at 16–18.  To determine which jurisdiction's laws should apply, the court must apply choice of law principles.  Because the court's subject matter jurisdiction in this

case is derived from the diversity of citizenship between the parties, the choice of law rules of the forum "state" are applied. *National Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 953 (D.C. Cir. 2001); *Rogers v. Ingersoll-Rand Co.*, 144 F.3d 841, 843 (D.C. Cir. 1998). In the District of Columbia, the forum "state" here, limitations arguments have long been considered procedural, thereby mandating application of the filing forum's statute of limitations. *Namerdy v. Generalcar*, 217 A.2d 109, 113 (D.C. 1966); *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995).

Eli Lilly seeks to have this court apply the revised Restatement (Second) of Conflicts of Law § 142 to this matter, under which statutes of limitations are treated as a matter of substantive law in certain instances. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142 cmt. e (1998). Were the court to agree and consider Eli Lilly's statute of limitations argument as a substantive matter rather than a procedural one, the court would be required to apply the law of the jurisdiction with the greatest interest in the litigation. *Greycoat Hanover F Street Ltd P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767–68 (D.C. 1995). The jurisdiction with the greatest interest, according to Eli Lilly, is New York.

Eli Lilly has made similar arguments before other courts in this jurisdiction. *See, e.g.*, *Reeves v. Eli Lilly & Co.*, 368 F. Supp. 2d 11, 26–27 (D.D.C. 2005); *Epstein v. Eli Lilly & Co.*, Civ. No. 03-236, slip op. at *4 (Sup. Ct. March 3, 2003). In rejecting Eli Lilly's argument that a D.C. federal district court should adopt the revised Restatement, Judge Lamberth wrote:

> While defendant asks this court to pioneer a path towards a more narrow choice of law analysis to the forum's statute of limitations approach, that is not the role for this federal court. This court must faithfully apply the same law the District of Columbia courts would apply if this case were presently before them. This court takes "the law

> of the appropriate jurisdiction as [found]; and we leave it undisturbed." *Tidler v. Eli Lilly and Co.*, 851 F.2d 418, 425 (D.C. Cir. 1998). . . . The decision to approach a forum choice of law statute of limitation analysis as a substantive matter—applying a different forum's statute of limitations time limit—is best left to the District of Columbia Court of Appeals.

*Reeves*, 368 F. Supp. 2d at 26–27. This court agrees with Judge Lamberth and concludes that, until the D.C. Court of Appeals instructs otherwise, statute of limitations analysis in the District of Columbia is to be treated as a procedural matter requiring reference to the filing forum's applicable statute. As such, the District's statute of limitations will apply to Gassman's claims.

*2. The Discovery Rule*

Applying District of Columbia law, product liability claims must be filed within three years "from the time the right to maintain the action accrues." D.C. Code § 12-301; *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998). In most cases, a cause of action will accrue at the time the injury actually occurs. *Mullin v. Washington Free Weekly*, 785 A.2d 296, 298 (D.C. 2001); *Diamond v. Davis*, 680 A.2d 364, 379 (D.C. 1996). However, in cases "where the relationship between the fact of injury and the alleged tortious conduct is obscure" when the injury occurs, a three-pronged "discovery rule" is applied to determine when the action accrues. *Diamond*, 680 A.2d at 379; *Williams v. Mordkofsky*, 901 F.2d 158, 162 (D.C. Cir. 1990). Under the discovery rule, a plaintiff's claim does not accrue, and the statute of limitations does not begin to run, until the plaintiff know[s] (or by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact and (3) of some evidence

of wrongdoing." *Bussineau v. President & Directors of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986).[2]

Importantly, when discussing what "quantum of knowledge is required to commence the running of the statute of limitations," the D.C. Court of Appeals has made clear that both actual notice and inquiry notice will suffice. *Diamond*, 680 A.2d at 372 ("There are two types of notice: 'actual notice' is that notice which a plaintiff actually possesses; 'inquiry notice' is that notice which a plaintiff would have possessed after due investigation."). A plaintiff is deemed to be on inquiry notice when, "if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice." *Id.* Whether a plaintiff has either actual or inquiry notice of his or her claim is a question of fact. *Id.*

Here, the parties agree that the discovery rule applies in this case, but dispute when Gassman "discovered" her cause of action, thereby starting the statutory clock. Eli Lilly argues that Gassman was placed on inquiry notice in 1999 when she "acknowledged her awareness of her reproductive injuries and their cause." Def.'s Mot. at 11. At this point, according to Eli Lilly, Gassman was under an obligation to investigate whether her injuries were the result of some wrongdoing. *Id.* Eli Lilly also contends that, had Gassman "pursued reasonable avenues of investigation"—including researching medical literature, reading newspaper reports, searching

---

[2] The D.C. Court of Appeals has cited two considerations when holding that the third prong of the discovery rule—evidence of wrongdoing—must be present before a cause of action can accrue: (1) it would be inconsistent with notions of justice to allow a statute of limitations to begin to run before the plaintiff "would reasonably know of any wrongdoing," *Diamond*, 680 A.2d at 379; and (2) an accrual rule that does not require the plaintiff to know of any wrongdoing "would encourage the filing of unfounded claims by plaintiffs seeking to protect their unknown rights." *Id.*

the Internet, or speaking with her doctors—"there is no question that she could have, and would have, . . . learned about alleged wrongdoing by DES manufacturers." *Id.* at 14.

Gassman responds by disputing that she was placed on inquiry notice in 1999 when she learned of her fertility problems and her T-shaped uterus. She begins by noting that fifteen percent of the population suffers from unexplained infertility, with many more suffering infertility as a result of endometrioses, dysmenorrhea, sexually transmitted diseases, and a host of other non-DES causes. Pl.'s Opp'n at 14. For this reason, Gassman argues that a problem pregnancy should not be "tantamount to notice of a lawsuit." *Id.*

More specific to her particular situation, Gassman also denies that her doctors ever informed her that her problems becoming pregnant were caused by her *in utero* DES exposure, despite the fact that the notes from her medical record indicate that she was so informed. She states that she believed that the fertility issues were the result of her husband's chemotherapy, not DES or her T-shaped uterus. To support this claim, Gassman asserts that her doctors were optimistic that, despite her T-shaped uterus, she could still become pregnant.

Gassman also asserts that, despite being aware that she was exposed to DES, she did not investigate Eli Lilly or other DES manufacturers because she trusted that pharmaceutical companies produced and sold safe drugs. She argues that "[t]here is not a single fact put forth by the Defendant that the doctors who treated [Gassman], her mother who took the drug, her friends, or anyone else in her milieu ever raised a hint suggesting wrongful conduct, failure to test, over promotion, negligence, failure to warn, failure to test or lawsuits, or even [that] DES causes infertility." *Id.* at 16. She also introduces the declaration of the co-founder of a national, not-for-

profit consumer organization dedicated to informing the public about DES, who states that "DES exposed individuals generally do not relate their exposure to any wrongdoing." *See* Affidavit of Patricia H. Cody, Pl.'s Opp'n, Exh. 7, ¶ 8 ("[DES exposed individuals] simply do not make the connection between their injury from a drug taken perhaps 35 to 40 years earlier by their mothers and wrongdoing by the drug's manufacturer.").

Further, Gassman asserts that, had she conducted an investigation into possible wrongdoing by DES manufacturers, reasonable avenues of investigation would not have placed her on actual notice of wrongdoing. To support this argument, she cites the fact that the overwhelming majority of articles discussing DES involved its effects on risks of cancer, not on fertility. She also argues that no DES manufacturer has ever admitted to liability or fault in any manner and that there is only one instance where a DES manufacturer settled a lawsuit without requiring an agreement of confidentiality from the plaintiff. Pl.'s Opp'n, Exh. 8. Gassman notes that, because of the asserted dearth of information about the ill effects of DES, the CDC, just this year, launched a comprehensive national program of DES education.

Ultimately, the court is left with a genuine dispute as to whether, in these circumstances, Gassman was, as a matter of law, on inquiry notice of her claim against Eli Lilly prior to February 19, 2000—three years before she filed her complaint in this case. As stated before, the issue of inquiry notice is a question of fact. At this stage of the proceedings, the court is required to believe the evidence of the non-movant and to draw all reasonable inferences in her favor. Doing so, the court must accept that Gassman was unaware of DES litigation prior to 2002, that she believed that her fertility was due to nothing other than her husband's impotency, and that she never suspected that Eli Lilly was guilty of any wrongdoing. In these circumstances, the

court cannot find as a matter of law that Gassman was on inquiry notice of her claims against Eli Lilly such that her claims are time-barred. *Dawson v. Eli Lilly & Co.*, 543 F. Supp. 1330, 1335 (D.D.C. 1982) (Even when "strong inference might be drawn as to [the plaintiff's] state of knowledge, such inferences should be left to the trier of fact."); *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 946 (D.C. 2003) ("[S]ummary judgment is improper when there is a disputed question about plaintiff's diligence in investigating a possible cause of action."); *Braune v. Abbott Labs.*, 895 F. Supp. 530, 551 (E.D.N.Y. 1995) ("[T]he law does not build upon it to demand that ill people assume that every medical problem that they suffer resulted from the intervention of a malefactor.  The public may reasonably assume the best rather than the worst

about the pharmaceutical industry.").[3]  Because there are genuine disputes as to material facts in this case, Eli Lilly is not entitled to summary judgment.[4]

## B. Identification of Manufacturer

Eli Lilly also argues that Gassman cannot identify Eli Lilly as the manufacturer of the DES to which she was allegedly exposed.  Def.'s Mot. at 18–23.  Under New York law, which governs the substantive matters in this case,[5] a plaintiff can seek relief under one of two different

---

[3]  To support a contrary result, Eli Lilly cites two DES cases in which summary judgment was entered against the plaintiff on statute of limitations grounds: *Albers v. Eli Lilly & Co.*, 354 F.3d 644 (7th Cir. 2003), and *Roberge v. Eli Lilly & Co.*, 2005 U.S. Dist. LEXIS 3956 (D.D.C. Mar. 11, 2005).  Eli Lilly's reliance on these cases is misplaced.  At the outset the court observes that neither opinion is binding on this court.  More importantly, both cases are distinguishable, thereby undermining their persuasive reach.

The plaintiff in *Albers* stipulated that she was on actual notice of both her injuries and the cause in fact of those injuries for longer than the D.C. limitations period.  *Albers*, 354 F.3d at 645.  This fact prompted the court to conclude that a "reasonable person would have commenced an inquiry . . . and swiftly would have found some evidence of wrongdoing." *Id.*  Here, however, Gassman testified that she was unaware until at least 2002 that her DES exposure caused her injuries, believing instead that her husband's chemotherapy was the culprit.  Gassman Statement ¶ 4.  The presence of this factual dispute is sufficient to distinguish *Albers*.

In *Roberge*, the plaintiff worked for an obstetrics and gynecology practice for many years, where she had "unfettered access to records documenting numerous cases of women with health problems resulting from DES exposure." *Roberge v. Eli Lilly & Co.*, 393 F. Supp. 2d 49, 52 (D.D.C. 2005) (denying motion to alter judgment).  From this important fact, the court concluded that there was "ample evidence in the record that plaintiff had continual access to resources that would have allowed her to investigate the possibility of filing a law suit based on DES exposure," such that the plaintiff was held to be on inquiry notice of her claims.  *Id.*  Gassman, however, did not have such extensive access to medical information about DES and its effects on fertility.  As such, this court cannot conclude that Gassman was, as a matter of law, on inquiry notice of her claims against Eli Lilly.

[4]  To quote Judge Green in the oft-cited *Dawson* decision, "[o]f course, the factfinder may always conclude that plaintiff did or through the exercise of due diligence should have made that discovery sooner than the plaintiff claims was the case."  543 F. Supp. at 1335.

[5]  Eli Lilly contends that New York is the only forum with any conceivable interest in this litigation under District of Columbia choice of law principles, and therefore its substantive law applies here.  *See Greycoat*, 657 A.2d at 767–68 ("Courts must apply the law of the forum with

theories of liability. The first—traditional product liability principles—requires that the plaintiff identify the specific product that actually caused the alleged injury in order for the plaintiff to meet his or her burden of proving causation. *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, 1073 (N.Y. 1989) (burden of proof on proximate causation lies with plaintiffs, which typically includes "identification of the exact defendant whose product injured the plaintiff.").

Alternately, in response to the difficulty inherent in identifying the exact manufacturer of the DES ingested by a plaintiff's mother many years prior to the lawsuit, the New York Court of Appeals allows DES plaintiffs to rely on market share liability, under which product identification is removed from the plaintiff's causation burden in exchange for relegating plaintiff to a recovery equal to the named defendants' share of the national DES market. *Id.* at 1078. In market share cases, unlike traditional product liability cases, some plaintiffs may be prevented from "recovering 100% of their damages." *Id.*

Market share liability is the "default" causation standard in New York DES cases. *In re DES cases*, 789 F. Supp. 552, 564 (E.D.N.Y. 1992). However, a DES plaintiff who believes that she can meet the traditional market product identification burden is free to attempt to do so. *Id.*; *Hymowitz*, 539 N.E.2d at 1073 ("In DES cases in which [product] identification is possible, actions may proceed under established principles of product liability.").

In this case, Gassman seeks recovery under traditional product liability principles and assert that Eli Lilly is the manufacturer of the DES that caused her injury. Eli Lilly argues that Gassman has not met her burden of proving "that it is reasonably probable, not merely possible

---

the more substantial interest in the litigation"). Gassman never disputes Eli Lilly's assertion that New York substantive law governs.

or even balanced, that the defendant was the source of the offending product." *Healey v. Firestone Tire & Rubber Co.*, 663 N.E.2d 901, 903 (N.Y. 1996). As such, Eli Lilly asserts that "no reasonable jury could find that Lilly's pill was more likely than not the one that caused Plaintiff's injuries," thereby entitling it to summary judgment under the traditional product liability theories and forcing Gassman to rely on market share liability for any recovery to which she might be entitled. Def.'s Mot. at 20.

Gassman responds by arguing that she has "submitted ample product identification evidence to create a genuine issue of fact for jury submission." Pl.'s Opp'n at 36. First, her mother testified that she took a "small white pill" to help sustain her pregnancy, a description that applies to the DES pill manufactured by Eli Lilly. Eli Lilly makes much of the fact that Gassman's mother cannot remember any other identifying characteristics, including dosage or markings. Def.'s Mot. at 21. Because many DES manufacturers other than Eli Lilly produce a small white DES pill, Eli Lilly argues that Gassman fails to meet her burden of establishing causation. *Id.* at 22; *Healy*, 663 N.E.2d at 903 (granting summary judgment on product identification grounds where plaintiff's description of a tire rim only narrowed the field of potential manufacturers to seven).

This argument would be more convincing had Gassman relied solely upon her mother's memory of the shape and color of the DES pill she ingested to identify the product that allegedly injured her. Such is not the case. Gassman also notes that it is undisputed that the DES in this case was purchased at Phoster Pharmacy in Hempstead, New York. To establish that Phoster Pharmacy sold DES manufactured by Eli Lilly, and only Eli Lilly, during the relevant time period, Gassman introduces an affidavit of Herbert Mindlin, who purchased Phoster's in 1975,

seven years after Gassman's birth. Mindlin testifies that he and the previous owner of Phoster's, Isaac Piel, were close friends. He claims that, beginning in 1968, he visited Piel at the pharmacy on numerous occasions. During these visits, Mindlin assertedly "had the opportunity to observe [Piel's] store, his practice, and the manner and method of the stocking of drugs in general and DES in particular, from the time of the late 60s until [Mindlin] actually bought [Piel's] store in 1975." Pl.'s Opp'n, Exh. 25 ¶ 7. Based on these observations, as well as "the usual customs and ordinary practice of the Phoster Pharmacy," Mindlin concludes that "the sole and exclusive brand of DES in the store was the Eli Lilly Brand, from the late 60s through the time [he] actually bought the store." *Id.* ¶ 8.

Eli Lilly argues that Mindlin's statements should be ignored because they do nothing more than confirm that Mindlin has no personal knowledge relevant to this case. Specifically, Eli Lilly notes that Mindlin does not state when in 1968 he began visiting Phoster Pharmacy, nor does he state the frequency of his visits. Def.'s Reply at 5. Without these details, Eli Lilly contends that Gassman "still has not established that Mindlin has any personal knowledge about the stocking and dispensing practices of Phoster's during the relevant time frame." *Id.* at 5–6.

While Eli Lilly's arguments may appeal to a jury, they are of no moment to this court for purposes of resolving the pending motion. The court is not only required to believe the competent evidence of Gassman, but must also grant all reasonable inferences in her favor. Accordingly, this court is satisfied that a jury question exists as to whether Gassman's injuries were caused by Eli Lilly's drugs. *Cf. McMahon v. Eli Lilly & Co.*, 774 F.2d 830, 832–34 (7th Cir. 1985) (affirming a directed verdict in favor of plaintiff when relevant pharmacy could not

remember particular brand, but "to the best of his knowledge," the wholesaler thought that the store bought DES manufactured by Eli Lilly).

### III.  CONCLUSION

For the aforementioned reasons, it is this 29th day of December, 2005, hereby

**ORDERED** that defendant's motion for summary judgment [#11] is **DENIED**.

                                                    Henry H. Kennedy, Jr.
                                                    United States District Judge